The opinion of the court was delivered by
Tilghman, C. J.
This is an action on the case for money had and recéived, &c. brought by Alexander M‘Clay, administrator of Daniel Grider,' deceased, (the defendant in error,) against Abraham Grider, the plaintiff in error, A special, verdict was found, the substance of which, lies in a small compass. Daniel Grider, the elder, father of Daniel the intestate, died seised in fee, of land in Lancaster county, leaving a widow, and only one child, the intestate. After his death, his land was sold by a decree of the Orphans’ Court, for the purpose of paying his debts, and supporting his infant child. The sale produced a considerable surplus, beyond the purposes for which it was designed, which was paid to the guardian of the infant Daniel Grider, who afterwards died intestate during his infancy. The question is, whether this money is to be considered as real or personal estate. If personal, the cause is with the plaintiff; if real, with the defendant. The District Court decided in favour of the plaintiff.
The learned counsel for the defendant, made an elaborate argument, in which he went largely into--the powers exerciséd by Chancery, in cases where by deed pr devise, it has been agreed, or ordered, that land shall be converged into money, or money invested in land. The governing principle in such cases is, that what ought to have been done, shall be considered as if done. But, as the object is, to effectuate the intent of the parties, it sometimes happens, that this object is best attained without making that conversion of real estate into personal, or personal into real property, which was originally intended. For instance, where it has been ordered, that money shall be invested in land, and settled on A. in fee, the trustee is not at liberty to pay the money to A., because that would be contrary to the trust; but upon a bill filed by A. being of full age, and under no incapacity, Chancery would order the money to be paid to him, because it would answer no useful purpose, to insist on A’s. being invested with land, which he might instantly convert into money.- But if A. were an infant, when he filed his bill, his prayer would not be granted, because, during his infancy, it would not be in his power to convert the land into money.j and it would be unjust to deprive his heir of the chance of inheriting the estate, in case A. should die during his infancy. This is the principle of Seely v. Jago, 1 P. Wms. 389, on which the counsel for the defendant mainly relies. But it appears to me, that *231 the analogy is Very imperfect between that case, and the one which is submitted in the special verdict before us. • In the former, and indeed, in all the Chancery cases which have been cited, the intent of the person making the settlement, the contract, or the devise, was to be pursued; in the latter, we are to be governed by our own act of assembly, from which the Orphans’ Court had no power to deviate. That court acts under a limited authority, derived from the act of assembly, and'has not the general powers of a Court of Chancery. We must consider the case then, upon the act of assembly of the 19th of April, 1794, 3 Sm. L. 143. But before I examine the provisions of .that law, it may be proper to make some general observations, which will throw light upon it. No feudal tenures having ever existed in Pennsylvania, her legislature has never shown an anxiety to preserve land for the benefit of the heir. On the contrary, it has always been her policy, to consider land, as a kind of property which should be subservient to the principles of justice. It always has been turned into money, where the claim of creditors, or the convenience of families required it Even the right of devise has yielded to the superior right of the creditor. William Penn took the Mosaic law for his model, by which the land was divided among the children equally, except, that the eldest son had a double portion. Since our independence, however, we have divided among the children with perfect equality. Our intestate laws aim at an equality oí property among the children, and to attain it, they convert land into money.. Where the land cannot be divided without injury, the whole is valued, and allotted to one, who pays the.others their proportions in money; and this money is completely money, without retaining any one quality of land. If one of the children be an infant, his share is paid to his guardian, and if he die during infancy, it goes to his personal representative. If one of the children be a feme covert, her proportion is paid to her husband, and no court in the Commonwealth has power to invest it in land, or even secure it for her separate use, as money. This was decided in the case of Yohe v. Barnet, 1 Binn. 363. Having taken this review of our general policy, -let us turn to the act of assembly under which the- Orphans’ Court decreed the sale of this land, and by which this cause must be decided. The 19th and 20th sections of the act of 19th April, 1794, are the most material. By the 19th section, the administrator is authorised to sell and convey “ such part of the intestate’s lands, as the Orphans’ Court of the county in which they lie, shall,' from time to time, think fit to direct, for defraying their just debts, maintainance of their children, and for putting them apprentices, and teaching them to read and write,” &c. The 20th section prescribes rules for the government of the Orphans’ Court, in their proceedings in these cases, and enacts, that <e If it shall happen that any lands be sold, by virtue of this act, for more than the said Orphans’ Court’s computation of the value there *232 of, then the administrator, or administrators, shall distribute, the same,as by this act is required fortheintestate’s real estate.” The meaning of this is very plain; the surplus money shall be subject to division among the same persons, and in the same proportions, that the land would have been, had it not been sold. The children would have been entitled to their share of the land respectively, in fee, and therefore, they shall have their shares of the money absolutely. The widow would have been entitled to her third of the land for life only; and therefore, she shall have the interest of one third of the surplus money for life. The principal of that one third, remains to all intents and purposes, money, and is distributable, after the death of the widow, among the children, in the same proportions in which they took the other two thirds. The expression, that the administrators shall distribute the surplus, is worthy of remark ; for it will be found, that throughout the whole of this act, where land is to go to the heirs, the word descend is used, and where money is to be divided, the expression is distributed. The attention of the legislature was drawn immediately to this surplus money. They were providing for it. It is inconeeiváble, therefore, why, if they had intended it to retain any quality of land, after its distribution, they should not have said so. It is of no importance to the heirs, whether the property be considered as real or personal, since they have the absolute disposal of it, in either case. But to those who succeeded to an heir who dies during infancy, the nature of the property may be of great importance, for it may go in a different direction, according as it be real or personal. It would be difficult, however, to assign a reason, why the legislature should be more desirous of preserving to this surplus money, the quality of land, than to the money which is distributed among the heirs, on the partition of a real estate, which does not admit of division. We find no such intention on the face of the law. Care is taken, that the money shall go to the person who would have been entitled to the land, had it remained unsold, and there the legislative provision stops, its object being accomplished. I know not then, what right the courts of justice have, to indulge speculative notions, in order to clothe money with qualities which do not naturally - belong to it, and thereby introduce an artificial system, which may be attended with more difficulties than can be foreseen. If this money is to be considered as land, how long is it to remain so ? Is it ever to return to its natural state, and when ? The counsel for the defendant have an answer of their own to these questions. They say, that if it comes to the hands of an adult, it is completely money at the moment of payment; provided that adult be not a feme covert. But if it comes to an infant, or a feme covert, it is tobe considered as land, until the infant arrives at full age, or the feme covert becomes suijuris. This, to be sure, would avoid many difficulties, and might be a good legislative provision. But what foundation is there for it in the *233 law as it now stands? I confess I can see none. I have examined all the cases in our own' courts, which were cited in the argument, but not one of them, nor any other which has reached us by tradition, supports the pretentions of the defendant. Diller v. Young 2 Yeates, 261, is the only one which bears upon the subject, and it makes nothing against the plaintiff. It was there decided, that where land is sold by order of the Orphans’ Court, for the payment of debts, that part of the surplus money which is paid to the widow, shall be held by her, only for her life, after which, it reverts to the children. This is exactly according to the plaintiff’s position. Whenever the land is sold, the proceeds become money, and so remain for ever. But the widow takes no greater interest in the money, than she would have done in the land; that is, an estate for term of life. Upon the whole then, although this special verdict presents a case very important in principle, yet I consider it as by no means difficult of solution. It does not appear to have been expressly decided, yet I think it has been generally under stood, that surplus money, arising from sales of land by order of the Orphans’ Court, whether it belong to an infant, a feme covert, or a male of full age, is to be considered simply as money, and nothing else. I am of opinion, therefore, that the judgment of the District Court should be affirmed.
Judgment affirmed.